UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

NOVAL WILLIAMS FILMS LLC,

                Plaintiff,

  -against-

JOHN BRANCA and JOHN MCCLAIN,
EXECUTORS OF THE ESTATE OF MICHAEL J.
JACKSON,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Case No. 1:14-cv-04711-PAC

## <u>DECLARATION OF KAREN LANGFORD</u>

## IN SUPPORT OF THE EXECUTORS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

Howard Weitzman
 (*pro hac vice*)
Jeremiah T. Reynolds
 (*pro hac vice*)
Joshua M. Rosenberg
 (*pro hac vice*)
KINSELLA WEITZMAN ISER KUMP &
ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850
Email: hweitzman@kwikalaw.com
     jreynolds@kwikalaw.com
     jrosenberg@kwikalaw.com

Jerry D. Bernstein (JB7631)
Rither Alabre (RA9280)
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: 212.885.5000
Facsimile: 917.332.3766
Email: jbernstein@BlankRome.com
     ralabre@BlankRome.com

*Attorneys for Defendants and Counterclaimants John Branca and John McClain,
Executors of the Estate of Michael J. Jackson*

I, Karen Langford, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my personal knowledge:

1.      Unless stated otherwise, I have personal knowledge of the facts set forth herein. If called as a witness, I could and would competently testify thereto.

### History of Working for Michael Jackson

2.      John Branca is a partner at Ziffren Brittenham LLP, and began representing Michael Jackson as his entertainment counsel in approximately 1980. Mr. Branca was Mr. Jackson's entertainment counsel for the remainder of the 1980's, through the 1990's (except for around three years in the early 1990's), and continuing for several years into the early 2000's. Mr. Branca was retained again by Mr. Jackson shortly before Mr. Jackson's death.

3.      I began working at Ziffren Brittenham LLP in June 1981 and am currently a paralegal at the firm. From June 1981 forward, during all the years that Mr. Branca represented Mr. Jackson, I worked closely on Michael Jackson matters, and worked closely with Mr. Jackson himself on countless matters. I maintained legal files for Mr. Jackson relating to the exploitation of Mr. Jackson's intellectual property, such as his musical compositions, sound recordings, photographs, short films, trademarks, and name and likeness rights. I dealt with a wide variety of other matters on Mr. Jackson's behalf, including business matters related to Mr. Jackson's activities as a musical artist, performer, celebrity, filmmaker, and other activities. Because of this, I am very familiar with Mr. Jackson's life and his business and legal affairs.

4.      Starting in 1983 and continuing thereafter for the entire time that I worked for Mr. Jackson while he was alive, it was always Mr. Jackson's custom and practice to (i) have photographers and/or videographers on hand to capture so-called "behind the scenes" and/or private happenings as a way of documenting his life and career and (ii) to own and/or control such materials in order to ensure that he would be in a position to maintain control over his

professional persona and image while at the same time protecting his personal privacy and the privacy of his family as Mr. Jackson placed incredibly high value on his personal privacy and the privacy of his family.

5.     Based on my experience of working for Mr. Jackson for nearly three decades (the 1980's, the 1990's [except for around three years in the early 1990's], and continuing for several years into the early 2000's), and to the best of my knowledge and recollection, I can think of no occasion after Mr. Jackson's decision in 1983 as described in the preceding paragraph on which Mr. Jackson  allowed any photographer or videographer to capture private images or footage of Mr. Jackson that he did not intend to own and/or control the use of. In the event Mr. Jackson did request or invite photographers or videographers to capture private images or footage of Mr. Jackson (*e.g.*, during a photo shoot), Mr. Jackson would not allow such images or footage to be publicly and commercially exploited without Mr. Jackson's prior approval, consent, and/or involvement. Indeed, Mr. Jackson would allow such footage to be shot only under his direction and solely for his own personal use, and such footage would be shot either as a work-for-hire for Mr. Jackson, or subject to a nondisclosure agreement with Mr. Jackson (or both). It was not Mr. Jackson's custom and practice to allow persons to videotape private moments of Mr. Jackson and then publicly and commercially exploit such footage or images without Mr. Jackson's prior approval, consent, and/or involvement, including during periods of time in the 1980's, 1990's and the 2000's that Mr. Branca and I worked for Mr. Jackson.

6.     I am not aware of Mr. Jackson ever giving approval or consent to Hasaun Muhammad, Matthew Akers, or any other person to shoot video footage of Mr. Jackson during the Ebony and Vogue photo shoots in or around 2007, and then publicly and commercially exploit that footage without Mr. Jackson's prior approval, consent, and/or involvement. Based on

my experience and to the best of my knowledge and recollection, Mr. Jackson never would have allowed an individual or entity to shoot private footage or capture private images of Mr. Jackson (*e.g.*, during a photo shoot) and then publicly and commercially exploit that footage or images without Mr. Jackson's prior approval, consent, and/or involvement.

## The Estate's Letters Regarding "Michael: The Last Photo Shoots"

7.      Michael Jackson passed away on June 25, 2009. Mr. Jackson's Will was admitted to probate in the Los Angeles Superior Court in August 2009, and that Court has exclusive jurisdiction to oversee the probate proceedings, which remain pending in Los Angeles County.

8.      Shortly after Michael Jackson's death on June 25, 2009, John Branca and John McClain were appointed by the Los Angeles Superior Court as the Co-Executors of the Estate of Michael J. Jackson (the "Estate" or the "Executors"). Mr. McClain and Mr. Branca oversee the Estate in Los Angeles, California. The files relating to the Estate (including files on copyright ownership and registration, employment contracts, and probate documents) are maintained in Los Angeles, California. Both Mr. Branca and Mr. McClain live in Los Angeles, California, and maintain their offices in Los Angeles, California. Substantially all of the Estate's real and tangible personal property is located in California. Substantially all of the Estate's business is operated in California by the personal representatives of the Estate and those under their supervision.

9.      When Mr. Branca was appointed as one of the personal representatives of the Estate, I resumed my work on business and legal affairs relating to Mr. Jackson. I am closely involved in all of those affairs, including decisions relating to the Estate's intellectual property (*i.e.*, the intellectual property of Mr. Jackson's before his death) and the maintenance of corporations and other legal entities owned by the Estate (that were owned by Mr. Jackson before his death).

10.    On or about May 15, 2014, the Estate learned from publicly-available information that a film director named Craig J. Williams and a film distributor called Lightning Entertainment ("Lightning") were exploiting a film about Michael Jackson called "Michael: The Last Photo Shoots" (the "Film") which features a "behind the scenes" look at Mr. Jackson's photo shoots in 2007 with Vogue and Ebony magazines. A true and correct copy of one such publication that the Estate saw is attached hereto as **Exhibit H**, which was marked as Exhibit 9 to the Deposition of Craig J. Williams.

11.    As noted above, the Estate's understanding was that Mr. Jackson's custom and practice had been at all material times to control ownership and exploitation of video footage and photographs taken of him in a private setting. Mr. Jackson's custom and practice was that such footage was shot either as a work-for-hire for Mr. Jackson, or subject to a nondisclosure agreement with Jackson (or both). Based on Mr. Jackson's custom and practice, the Estate believed (and continues to believe) that the "behind the scenes" footage in the Film was shot by someone who was hired by Mr. Jackson, and that such footage could only be publicly and commercially exploited with his or the Estate's consent.

12.    The Estate's belief that Craig Williams and Lightning did not have the right to exploit the "behind-the-scenes" footage in the Film was bolstered by the fact that the footage was allegedly created in 2007 but not commercially exploited footage until 2014, five years after Jackson's death in 2009. Given the Estate's duty to protect its intellectual property and to prevent unauthorized exploitation of images of Mr. Jackson, such "after death" exploitation of footage of Mr. Jackson required the Estate's close scrutiny and investigation. Accordingly, on May 20, 2014, the Estate's attorneys sent a letter to Craig Williams and Lightning setting forth the Estate's foregoing contentions and requesting a copy of the Film to further examine the Estate's

rights in the Film. A true and correct copy of that letter and cover email is attached as Exhibit C to the Declaration of Howard Weitzman, submitted concurrently herewith.

13.     On May 28, 2014, Ray Markovich, one of the managers for Plaintiff Noval Williams Films LLC ("Plaintiff"), sent a letter to the Estate explaining how Plaintiff obtained the footage (the "Footage") shown in the Film, what the Footage contained, and why Plaintiff believed it could exploit the Footage. A true and correct copy of that letter and cover email is attached as Exhibit D to the Declaration of Howard Weitzman, submitted concurrently herewith.

14.     Mr. Markovich's May 28, 2014 letter referenced email correspondence between me and a "third party" who Plaintiff alleged was an owner of the Footage and from whom Plaintiff claimed it acquired rights to the Footage. After reviewing Mr. Markovich's letter, I searched my email archives and found a January 12, 2012 email that I received from Kendall Minter, which I understood to be the email correspondence that Mr. Markovich was referring to. A true and correct copy of that January 12, 2012 email is attached hereto as **Exhibit I**. In that email, Mr. Minter told me that it was his client's "first wish to consummate this sale to the Estate rather than to private collectors." This comported with my understanding that the footage in the possession of Mr. Minter's client – which at this point I now understood was the same Footage that Plaintiff and Lightning were trying to exploit – could not be publicly and commercially exploited without the Estate's consent. Indeed, at no point did I tell Mr. Minter or his client that they had the right to publicly and commercially exploit this footage without the Estate's consent. The first time I became aware that this footage was being publicly and commercially exploited was in May of 2014, when the exploitation of the Film was announced and we received the May 28, 2014 letter from Mr. Markovich about the person who was the alleged source of the Footage that Plaintiff and Lightning were trying to exploit.

15.     On June 11, 2014, the Estate's attorneys sent a response letter to Mr. Markovich and Mr. Williams further explaining the Estate's position regarding its rights in the Footage, and again requested a copy of the Film. A true and correct copy of that letter and cover email is attached as Exhibit E to the Declaration of Howard Weitzman, submitted concurrently herewith.

16.     In or around June 12, 2014, I reviewed a DVD copy of the Film that Lightning provided to the Estate. The Film bore the watermark of "Property of Lightning Entertainment." I found that the Footage in the Film indeed contained private footage of Mr. Jackson that the Estate believed could not be publicly and commercially exploited without the Estate's consent, including but not limited to sensitive footage of Mr. Jackson in his private dressing room (*e.g.*, relating to his hair, make-up, and body). Based on my knowledge and experience of working with Mr. Jackson, Mr. Jackson never would have allowed this type of private footage to be publicly and commercially exploited without his consent, approval, and/or involvement – consistent with his custom and practice.

17.     Also, in reviewing the Film, I noticed that the Film contained photographs (the "Photographs") which depict images from photographs whose copyrights are owned by companies wholly owned by the Estate. Those companies wholly-owned by the Estate are Triumph International, Inc. ("Triumph") and Optimum Productions ("Optimum"). True and correct copies of the Photographs are attached hereto as **Exhibit J**, which were marked as Exhibit 10 to the Depositions of Craig J. Williams and Raymond Markovich. True and correct copies of the copyright registrations of the Photographs owned by Triumph and Optimum are attached hereto as **Exhibit K**, which were marked as Exhibit 11 to the Depositions of Craig J. Williams and Raymond Markovich. The copyright registrations in Exhibit K where Douglas Kirkland is listed as the copyright claimant were filed by Mr. Kirkland notwithstanding that the

original 1983 agreement for his services provided that Optimum is the owner thereof and are further subject to a settlement agreement wherein Optimum's ownership of such photographs is confirmed by Mr. Kirkland.

18.      Generally speaking, Mr. Jackson set up different solely-owned corporations during his lifetime for different aspects of his business or property. For example, Triumph is the corporation through which Mr. Jackson held and licensed intellectual property rights relating to his name and likeness rights (or his "publicity" rights), along with his copyrights in various photographs and trademarks. Triumph is a California corporation that was organized in 1984 by Michael Jackson. Mr. Jackson was its sole stockholder during his lifetime, and the Estate is now the successor to Mr. Jackson's interests. Triumph's principal place of business is in Los Angeles, California. All of Triumph's records are maintained in Los Angeles County.

19.      Optimum is a California corporation that was solely-owned by Mr. Jackson prior to his death and is now owned by the Estate. Optimum is an entity that was used by Mr. Jackson in connection with the creation of short films intended to promote his individual recordings and other audiovisual works. Optimum's principal place of business is in Los Angeles, California. All of Optimum's records are maintained in Los Angeles County.

20.      To protect the legal rights and economic interests of the Estate in good faith, as the Estate has previously, routinely, and successfully done in matters involving the unauthorized exploitation of Mr. Jackson's image and the Estate's intellectual property and violation of any agreements involving the same, and to fulfill the Executors' duties and protect the assets of the Estate, the Estate's attorneys sent cease-and-desist letters to Lightning and to Plaintiff on June 17 and 18, 2014, respectively. True and correct copies of those letters and cover emails are attached as Exhibits F and G to the Declaration of Howard Weitzman, submitted concurrently herewith.

21.    Indeed, all of the Estate's pre-litigation communications with Plaintiff and
Lightning in May and June of 2014 were sent in good faith by the Executors to fulfill their duties
as Executors of the Estate and to protect the assets of the Estate, and reflected the Estate's
understanding of Mr. Jackson's custom and practice regarding video footage and photographs
taken of him, as explained in greater detail above.


I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct to the best of my personal knowledge.

Executed on April 24, 2017, in Los Angeles, California.


_Karen Langford_
Karen Langford